IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

───────────────────────────────────────────────

|  |  |  |
|---|---|---|
| FUSION ELITE ALL STARS, et al., | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| v. | ) | No. 22-cv-2226-SHL-tmp |
| | ) | |
| NFINITY ATHLETIC LLC, | ) | RELATED CASE: |
| | ) | 20-cv-2600-SHL-tmp |
| Respondent. | ) | |

───────────────────────────────────────────────

**ORDER GRANTING IN PART AND DENYING IN PART MOVANTS' MOTION TO COMPEL AND GRANTING IN PART AND DENYING IN PART RESPONDENT'S CROSS-MOTION TO QUASH**

───────────────────────────────────────────────

Before the court by order of reference is movants' Motion to Compel Nfinity Athletic LLC to Comply with Subpoena Duces Tecum and Nfinity's Cross-Motion to Quash Subpoena, filed on March 2, 2022, and March 16, 2022, respectively. (ECF Nos. 1, 6.) The motions were originally filed in the Northern District of Georgia and were transferred to this district on April 12, 2022. (ECF Nos. 9-10.) The undersigned finds that a hearing is unnecessary and that the motions can be resolved on the briefs. For the reasons below, both motions are GRANTED in part and DENIED in part.

## I.   BACKGROUND

The present case relates to a complex antitrust lawsuit brought by movants against Varsity Brands, LLC, its affiliated brands and companies, and the United States All Star Federation

("USASF").[1] In brief, the movants allege that Varsity and USASF conspired to and did in fact form a monopoly over the cheerleading industry in the United States.

As part of discovery in that lawsuit, the movants issued a subpoena duces tecum to Nfinity in November 2020. (ECF No. 1.) Nfinity is an athletic apparel and accessories supplier that largely focuses on cheerleading equipment, (ECF No. 6-2 at 2), and is "one of [Varsity's] most significant market competitors." (Id. at 8.) This subpoena contained thirty-three document requests seeking various business records from Nfinity, (ECF No. 1 at 1, n. 1), including sales data, cost data, and transaction records. (ECF No. 1-1 at 13.) Nfinity responded on December 7, 2020. (ECF No. 1-3.) In their response, Nfinity argued that "almost all of the documents requested in the Subpoena are confidential and relate to non-public information concerning highly competitive subjects[.]" (Id. at 2.) However, they ultimately agreed to produce documents responsive to thirteen of the requests. (ECF No. 1-6 at 2.) Both sides communicated over the next several months about the

---

[1] Fusion Elite All Stars v. Varsity Brands, LLC, 2:20-cv-2600-SHL-tmp (W.D. Tenn. Aug. 13, 2020) ("Fusion Elite"). Two other related cases brought against Varsity and its prior and present owners are currently proceeding before presiding U.S. District Judge Sheryl Lipman: American Spirit and Cheer Essentials Inc. v. Varsity Brands, LLC, 2:20-cv-02782-SHL-tmp (W.D. Tenn. Jul. 24, 2020) and Jones v. Bain Capital Private Equity, 2:20-cv-2892-SHL-tmp (W.D. Tenn. Dec. 10, 2020).

production, but no documents were ever produced and communications

from Fusion Elite to Nfinity have gone "largely unanswered" since

June 4, 2021. (Id.)

On March 2, 2022, the movants filed the present motion seeking

to compel production and responses to seventeen of the original

thirty-three requests. (ECF No. 1.) Nfinity responded in

opposition with a Cross-Motion to Quash Subpoena and Motion for

Protective Order on March 16, 2022. (ECF No. 6.) The movants also

filed a Motion to Transfer the dispute, which had originally been

filed in the Northern District of Georgia, to the Western District

of Tennessee. (ECF No. 3.) Although Nfinity opposed this motion,

it was granted on April 11, 2022, and the case was transferred the

next day. (ECF Nos. 9-10.)

The movants' motion only seeks to compel production as to

seventeen of these requests, namely Request Nos. 7, 9, 11, 17-29,

and 33. (ECF No. 7 at 6.) In their response to the subpoena,

Nfinity objected to all these requests, but agreed to produce

documents (subject to clarifications on time period and under an

adequate protective order) as to Request Nos. 11, 23, 24, 25, 26,

28, and 29. Nfinity also indicated that they did not believe they

possessed any documents responsive to Request No. 9. Thus, of the

seventeen requests at issue here, Nfinity has refused to provide

documents as to Request Nos. 7, 17, 18, 19, 20, 21, 22, 27, and

33. These requests are quoted in pertinent part below so as to
summarize the information they seek:

> **REQUEST NO. 7:** All Documents reflecting studies,
> analyses, and Communications referencing or relating to
> the following: a. Nfinity's prices, fees, rebates,
> discounts, or other terms of sale for Apparel; b.
> Nfinity's costs, sales, revenues, and profits regarding
> Apparel; or c. Nfinity's Apparel products and other
> goods it sells.
>
> **REQUEST NO. 17:** For each year of the Relevant Time
> Period, all financial statements, equity valuations,
> asset appraisals, financial models, budgets (proposed or
> otherwise), projections, investor presentations, pro
> formas, and similar financial documents relating to
> Nfinity and/or Nfinity's sale of Apparel.
>
> **REQUEST NO. 18:** All of Your monthly, quarterly, and
> annual audited and unaudited financial statements and
> related data, including profit and loss statements,
> balance sheets, cash flow statements, income statements,
> regulatory filings, issuance of equity or debit, loans,
> and money owed or receivable.
>
> **REQUEST NO. 19:** Documents sufficient to show sales,
> revenues, profits or losses, in as granular form as the
> information is maintained, for (a) all Apparel sold by
> Nfinity, and (b) any and all other goods or services
> sold by Nfinity.
>
> **REQUEST NO. 20:** Documents and data (in machine-readable
> format such as *.csv, *.txt or other native flat file
> format) sufficient to show Your actual costs, in as
> granular form as the information is maintained,
> associated with all of Your Apparel, on a monthly basis
> and in electronic format[.]
>
> **REQUEST NO. 21:** Documents and data (in machine-readable
> format such as *.csv, *.txt or other native flat file
> format), in as granular form as the information is
> maintained, itemized on a purchaser by purchaser basis,
> including for each customer or purchaser, at minimum,
> name, address, phone number, email address, customer
> number, and main contact person or persons, including
> date, in electronic format[.]
>
> **REQUEST NO. 22:** Documents and data (in machine-readable
> format such as *.csv, *.txt or other native flat file

format), in as granular form as the information is maintained, including by transaction or receipt, broken down by purchaser, including at minimum for each purchaser the name, address, phone number, email address, customer number, and main contact person or persons, itemized by product code, number of items sold, description of product, price, date, check, or other payment method, and transaction[.]

**REQUEST NO. 27:** All Documents reflecting, relating to, or concerning studies, analyses, memoranda, slide decks, white papers, or other Documents referencing or relating to the effects of the Network Agreement, Family Plan, or pricing more generally on: a. Nfinity's profitability; b. Nfinity's ability to compete with Varsity or any other persons or entities in selling Apparel or engaging in any other line of business; c. Nfinity's ability to attract Gyms or Athletes to buy Your Apparel or to purchase any other product or service from Nfinity; or d. Nfinity's prices, fees, rebates, discounts, or other terms of sale.

**REQUEST NO. 33:** All Documents and/or Communications referencing or relating to the Plaintiffs.

## II.   ANALYSIS

### A.   Legal Standards

Federal Rule of Civil Procedure 45 allows parties to issue subpoenas directing non-parties to produce documents relevant to a litigation. "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena." Fed. R. Civ. P. 45(d)(1). Subpoenas thus have "the same scope as provided in [Federal Rule of Civil Procedure] 26(b)." Fed. R. Civ. P. 45, Advisory Committee Note to Subdivision(d), 1946 Amendment; see also Boodram v. Coomes, No. 1:12CV-00057-JHM, 2016 WL 11333773, at *3 (W.D. Ky. Jan. 5, 2016).

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). The party seeking discovery is obligated to demonstrate relevance. Johnson v. CoreCivic, Inc., No. 18-CV-1051-STA-tmp, 2019 WL 5089086, at *2 (W.D. Tenn. Oct. 10, 2019). Upon a showing of relevance, the burden shifts to the party opposing discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case. William Powell Co. v. Nat'l Indem. Co., No. 1:14-CV-00807, 2017 WL 1326504, at *5 (S.D. Ohio Apr. 11, 2017), aff'd sub nom. 2017 WL 3927525 (S.D. Ohio June 21, 2017), and modified on reconsideration, 2017 WL 4315059 (S.D. Ohio Sept. 26, 2017). Six factors are relevant to proportionality: (1) "the importance of the issues at stake in the action;" (2) "the amount in controversy;" (3) "the parties' relative access to relevant information;" (4) "the parties' resources;" (5) "the importance of the discovery in resolving the issues;" and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Where a subpoena has been issued under Rule 45, courts should also "balance the need for the discovery against the burden imposed on the person ordered to produce documents, and that person's status as a nonparty is a factor weighing against disclosure." Arclin

-6-

USA, LLC v. Vits Tech. GmbH, 2:20-mc-48, 2020 WL 6882600, at *2

(S.D. Ohio Nov. 24, 2020).

**B.   Requests**

   1.   Request Nos. 7, 17-22

Fusion Elite argues that Request Nos. 7, 17-22 seek "(1)

transactional sales data for Apparel; (2) Apparel cost data; and

(3) data relating to prices, fees, rebates, discounts, terms of

sale, or any other financial arrangement regarding Apparel." (ECF

No. 1-1 at 13.) They support the relevance of these requests with

a declaration from Hal Singer, Ph.D., a microeconomist with

experience testifying as an economic expert in antitrust cases.

(ECF No. 1-5.) Singer's declaration states that "transactional

data is the lifeblood of economic analyses presented in all or

almost all antitrust cases," and that plaintiffs require the exact

data sought in these requests in order to help him in "analyzing

the impact of [Varsity's] conduct on prices over time and to

quantify the aggregate damages of the proposed Class of Gyms and

parents." (Id. at 4.) Fusion Elite's brief uses Singer's exact

description of the data he requires to perform his analysis as the

description of the data sought in Request Nos. 7, 17-22, referring

to it generally as "transactional data." Compare (ECF No. 1-1 at

13) with (ECF No. 1-5 at 4-5.) Nfinity disagrees with this

description, arguing that transactional data is only sought in

Request Nos. 19 and 20 at most.[2] (ECF No. 6-1 at 6.) Nfinity makes two arguments as to why the transactional data should not be produced. First, they argue that the information is confidential and that its disclosure would "cause significant and lasting harm to Nfinity."[3] (Id. at 9.) Second, they argue that Fusion Elite has not shown that Nfinity's transactional data is necessary to resolve the case. They do not dispute the relevance of transactional data related to Apparel.[4]

      a.    Confidentiality

The court may modify a third-party subpoena if it requires "disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P.

---

[2]Nfinity also argues that Request No. 19 reaches beyond their Apparel products, which is the only relevant market. In their reply, Fusion Elite states that they only seek this data as "related to Apparel." (ECF No. 7 at 5.) Thus, the undersigned considers the request narrowed to solely the Apparel market.

[3]Nfinity combines this argument with an argument that the cost of production would be unreasonably high. The undersigned will address arguments regarding cost and payment separately.

[4]Even if they had, the undersigned finds that the requested transactional data related to Apparel is relevant to the underlying action. The pricing and cost of Nfinity's Apparel is "clearly relevant in that it either directly pertains to or may lead to information that supports or refutes plaintiffs' claims regarding the impact of [Varsity's] activities on the prices of [Apparel] sold or distributed in the United States." In re Mushroom Direct Purchaser Antitrust Litig., Master File No. 06-0620, 2012 WL 298480, at *5 (E.D. Penn. Jan. 31, 2012) (finding third party transactional data of the type requested here relevant to a monopoly antitrust claim).

45(d)(3)(B)(i). Parties seeking to quash a subpoena must "first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful." Direct Purchaser Class Plaintiffs v. Apotex Corp., Case No. 16-62492-MC-ZLOCH, 2017 WL 4230124, at *2 (S.D. Fla. May 15, 2017) (quoting Centurion Indus., Inc. v. Warren Steurer and Assocs., 665 F.2d 323, 325 (10th Cir. 1981)). If that burden is met, then the burden shifts to the party seeking the information to establish that it is relevant and necessary, and the court must balance the potential harm against the demonstrated need. Fanning v. Honeywell Aerospace, No. 3-14-1650, 2016 WL 11652957, at *1 (M.D. Tenn. Aug. 12, 2016) (citing Dow Corning Corp. v. JIE XIAO, 283 F.R.D. 353, 354 (E.D. Mich. 2012)); see also Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576, 578-79 (N.D. Ga. 1989). In this balancing test, harm is "not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order." Coca Cola Bottling Co. v. The Coca Cola Co., 107 F.R.D. 288, 293 (D. Del. 1985).

Nfinity has shown that the transactional data sought here constitutes highly confidential business information. The declaration of Tate Chalk, Nfinity's founder and principal, states that the company keeps "customer information, terms of sales, contracts, offers, negotiations, pricing information, product and material costs, labor costs, revenues, receipts, profits and

profitability, losses, income, cash flows, [and] its market strategies and analyses" confidential as a matter of course. (ECF No. 4-2 at 6.) Disclosing this information broadly would allow Nfinity's competitors, including the defendants in the underlying action, to undercut their prices, target their customers, and analyze their position for potential weaknesses. (Id. at 9.) "Plaintiffs do not question Nfinity's transactional data is confidential," but instead assert that Nfinity has not shown "how [they] could be harmed by producing this data." (ECF No. 7 at 8.) Although the plaintiffs correctly state that "blanket and generalized assertions of confidentiality" cannot alone sustain a motion to quash, Nfinity has shown more. (Id. at 9) (quoting In re Mushroom, 2012 WL 4230124, at *5). Nfinity claims that "Varsity has been seeking to acquire" this transactional data for years, (ECF No. 6-1 at 9), and that "courts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor." Laborers Pension Trust Fund-Detroit and Vicinity v. CRS Poured Concrete Walls, Inc., No. 04-CV-74714-DT, 2006 WL 3804912, at *7 (E.D. Mich. Dec. 22, 2006) (quoting Am. Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 741 (Fed. Cir. 1987)). Further, Nfinity argues that the risk of harm is "particularly stark" here due to Varsity's alleged anticompetitive behavior and due to accusations by another third-party that Fusion Elite, in the years prior to this litigation, "misappropriated [the third party's]

-10-

intellectual property and gave it to Varsity." (ECF No. 6-1 at 10)

(citing ECF No. 6-5.) Given the nature of the allegations against

Varsity, the granular level of data sought, and the specific

examples in Chalk's declaration, the undersigned finds that the

transactional data sought is highly confidential and could

potentially harm Nfinity if disclosed.

However, plaintiffs argue that the "current protective order

protects Nfinity from harm." (ECF No. 7 at 9.) The Protective Order

allows trade secrets or other confidential business information to

be designated "Highly Confidential," which limits its disclosure

to outside counsel, experts who have signed an agreement to be

bound by the order, the court, or special masters/third parties

who have also agreed to be bound. (ECF No. 77 at 12-13.) Nfinity

argues that this Protective Order is "illusory and impotent" and

"requires Nfinity to submit to the jurisdiction in the Western

District of Tennessee . . . to protect its confidential business

information." (ECF No. 6-1 at 22.)

The court disagrees with Nfinity's view of the Protective

Order. Highly Confidential information cannot be seen by the

parties themselves and practically functions as an "Attorney's

Eyes Only" designation, which courts have routinely found to be

adequate to protect confidential business information subpoenaed

in antitrust actions. See In re Novartis & Par Antitrust Litig.,

No. 2:19-mc-00149, 2019 WL 5722055, at *10 (E.D. Penn. Nov. 5,

-11-

2019) (collecting cases). Since the parties will be unable to view or access this data, any concern stemming from allegations that Fusion Elite provided a different third-party's intellectual property to Varsity is assuaged. Given the undersigned's finding that the data sought constitutes highly confidential business information, any production ordered would be produced as Highly Confidential, undermining Nfinity's claim that "the officers, directors, and employees of Varsity and Plaintiffs" could access the information. The undersigned finds that the existing Protective Order's Highly Confidential designation is adequate to protect Nfinity's transactional data.

b.   Necessity

Next, the court must determine if Fusion Elite has shown that the transactional data is sufficiently relevant and necessary to overcome the risk of harm from producing the transactional data as Highly Confidential under the existing Protective Order. See Fanning, 2016 WL 11652957, at *1. The parties do not contest the relevance of the transactional data, but Nfinity argues that Fusion Elite has not demonstrated that the data is necessary. "Disclosure of the evidence is considered necessary when the information is required for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." Cash Today of Texas, Inc. v. Greenberg, No. Civ.A. 02-MC-77-GMS, 2002 WL 31414138, at *3 (D. Del. Oct. 23, 2002) (quoting

-12-

Coca Cola, 107 F.R.D. at 293)). Where a party demonstrates relevance and necessity, "discovery is virtually always ordered[.]" Coca Cola, 107 F.R.D. at 293 (collecting cases); see also Apotex Corp., 2017 WL 4230124, at *4 ("Courts faced with analogous situations typically favor limited disclosure.") (collecting cases).

Nfinity argues that Fusion Elite's brief and Singer's declaration demonstrate that transactional data "would merely be helpful and presumably make life easier for Plaintiffs' attorneys." (ECF No. 6-1 at 11.) They primarily argue that, because data could be gotten and has been sought from other third parties, Nfinity's data specifically cannot be truly necessary to proving Fusion Elite's case. Nfinity also attaches a declaration from Jonathan Marks, a forensic accountant, who states that Fusion Elite could obtain similar data from other public sources or from conducting a survey. (ECF No. 6-3 at 3-4.)

The undersigned finds that Fusion Elite has shown a need for the transactional data. Singer's declaration states that "it is common practice for Plaintiffs in large antitrust cases such as this one to subpoena and receive detailed transactional data from third parties to better inform their expert's economic analyses," a statement supported by his CV and a review of the case law. (ECF No. 1-5 at 5); see Novartis, 2019 WL 5722055, at *2-3 (granting discovery of third party transactional data to allow for experts

to conduct a "before and after" pricing analysis); <u>Seegert v.</u>
<u>Rexall Sundown, Inc.</u>, No. 17-cv-01243-JAH(JLB), 2019 WL 12044514,
at *8 n.6 (S.D. Cal. Mar. 26, 2019) (noting that plaintiffs had
served multiple third party subpoenas searching for sales data in
order to establish class damages); <u>Apotex Corp.</u>, 2017 WL 4230124,
at *2 (granting discovery of third party transactional data to
determine effects of defendant's conduct on pricing). Marks's
declaration, while helpful in terms of understanding the overall
cost and burden of production, suggests a lack of familiarity with
antitrust litigation. (ECF No. 6-3) ("In my experience, and after
speaking with other colleagues, one of whom is an economist, none
of us are aware of, nor have been engaged in, cases where a non-
party to a matter was required to produce confidential
transactional data to compare prices and calculate economic
damages.") Varsity itself has produced transactional data, and
Fusion Elite's comparative analyses, necessary to prove damages,
require data of similar detail. As Singer notes, "it would *not* be
appropriate to receive aggregated or average data over the relevant
periods" as this would harm "Plaintiffs' ability to accurately
compare prices for like goods over time." (ECF No. 1-5 at 5-6.) In
the next paragraph, Singer states the need clearly: "Plaintiffs'
economists' ability to develop an econometric model demonstrating
Varsity's impact in the Apparel market depends in part on the
availability of high quality, third-party data that was

-14-

uncontaminated by the challenged conduct." (Id. at 6.) Nfinity, self-described as one of Varsity's largest competitors in the Apparel market, is a primary source of that necessary data.

Nfinity's core argument is essentially that, because other third parties exist in this market and plaintiffs have sought data from many of them, no one single third party's data is truly essential to plaintiffs' case. But the flaw with this argument is that if plaintiffs are seeking third party data from a representative sample of the market (as is common in antitrust cases to prove damages), no one data set could be described as necessary, even though such data is necessary as a whole. Each third party could tell the plaintiffs to get the data from someone else, which for practical purposes would mean plaintiffs could not get the data from anyone. While Nfinity's specific data may not be indispensable to Fusion Elite's case, transactional third-party data of the type sought here is necessary to prove certain elements of their case. Fusion Elite has presented evidence that their expert requires this data in order to conduct analyses necessary to prove their theory of the case. The undersigned finds that they have demonstrated the need to overcome the slight risk of harm in producing this data as "Highly Confidential" under the Protective Order.

Based on the above, the undersigned hereby ORDERS that Nfinity produce their transactional data as requested in Request Nos. 19,

20, and 21 as to Apparel goods only. Nfinity is correct that
Request Nos. 7, 17, and 18 reach beyond the scope of transactional
data, and they are DENIED. All data produced shall be limited to
the time period of January 1, 2013 to December 31, 2020, and shall
be produced as "Highly Confidential" under the Protective Order.[5]
Fusion Elite must take great care in protecting the confidentiality
of this information. Nfinity and Fusion Elite should work closely
together in order to limit costs and produce this data in an
efficient manner. At many points in their motion, Fusion Elite
expressed a willingness to narrow, modify, or limit their requests
based on clarifications or guidance from Nfinity regarding how
their data is stored, and this production is ordered with that
spirit in mind.

Finally, the court orders that the production be completed
within 28 days of the entry of this order. This order *does not*
extend any other deadlines in this case, including the expert
disclosure deadline. Fusion Elite waited until March 2, 2022, to
file this motion, just a month and a half before discovery was set

---

[5]This time period matches the start date sought by Fusion Elite
and runs until the end of the time period for which Varsity
produced their transactional data. This will limit the data
produced to that which can be directly compared to Varsity's and
will further limit the potential harm from disclosing such data.
See In re Mushroom, 2012 WL 298480, at *5 ("BFI provides no
explanation as to how the information requested, now between four
and fourteen years old, might, in today's marketplace, be used to
BFI's detriment by the identified party-competitors.")

to close. This was despite communications with Nfinity breaking down, at the latest, in June of 2021. While this order does not bar Fusion Elite from filing a motion to extend the Scheduling Order's deadlines, it is puzzling, to say the least, that Fusion Elite waited over nine months to seek Nfinity's compliance with the subpoena.

2.   Request Nos. 9, 11, 23-29, 33

Fusion Elite's subpoena requests more than just transactional data. The subpoena also requests "documents related to Nfinity's ability to compete in the All Star Apparel Market and its relationship with [Varsity]," the "impact of Varsity and its Network Agreements and Family Plans on Nfinity's ability to compete in the All Star Apparel Market[,]" and "documents and communications referencing or relating to Plaintiffs." (ECF No. 1-1 at 16-18.) In their motion, Fusion Elite states that Request Nos. 9, 26, 27 and 33 could be resolved with certain proposed search terms.[6] A potential resolution for Request Nos. 11, 23-25, 28 and 29 is less clear. However, in Nfinity's response to the subpoena, they stated that they would produce responsive documents as to Request Nos. 11, 23, 24, 25, 26, 28, and 29, if under a Protective Order and limited by time.

---

[6]These terms are: "Network Agreement," "Family Plan," "Fusion Elite," "Spirit Factor," "Stars and/& Stripes," "Radek," "Hayes," and "Cherasaro." (ECF No. 1-1 at 18.)

As these requests are unrelated to transactional data, the justification offered by Singer's declaration is inapplicable. Fusion Elite offers little, if any, justification in their motion for these requests. Given the alleged cost of producing the transactional data and the late filing of the motion to compel, the court finds that the burden of producing these documents outweighs any benefit they may have to the plaintiffs. Nfinity shall produce only the documents they agreed to produce in their response to the subpoena, specifically as to Request Nos. 11, 23, 24, 25, 26, 28, and 29. Any production shall be done under the Protective Order in this case and within the time period of January 1, 2013 to December 31, 2020. The requests and form of production should be tailored in accordance with how Nfinity stores its data to minimize cost and burden.

## C.   Costs

Federal Rule of Civil Procedure 45(d)(3)(C)(ii) allows the court to ensure that a subpoenaed party be "reasonably compensated" where a subpoena requires disclosing trade secrets or other confidential business information. Similarly, Rule 45(d)(2)(B)(ii) requires that any order granting a motion to compel production from a nonparty protect that nonparty "from significant expense resulting from compliance." Courts have held that determining who should bear the costs of a non-party subpoena must be "an individualized consideration rather than a generalization," so

-18-

that it may be determined whether "the cost involved in complying

with the summons in question exceed[s] that which the respondent

may reasonably be expected to bear as a cost of doing business."

E.E.O.C. v. Kronos Inc., 694 F.3d 351, 371 (3d Cir. 2012) (quoting

United States v. Friedman, 532 F.2d 928, 936 (3d Cir. 1976)

(internal quotation marks omitted)). However, "the Advisory

Committee's Notes, commentaries, and the small universe of

decisions applying the Rule appear to intimate" that the party

issuing the subpoena should typically bear the total cost of

compliance. Georgia-Pacific LLC v. American Intern. Specialty

Lines Ins. Co., 278 F.R.D. 187, 190 (S.D. Ohio 2010) (quoting In

re First American Corp., 184 F.R.D. 234, 241 (S.D.N.Y. 1998)).

Factors that courts should consider when determining how to

allocate costs include "whether the nonparty has an interest in

the outcome of the case, whether the nonparty can more readily

bear the costs than the requesting party, and whether the

litigation is of public importance." Linder v. Calero-

Portocarrero, 180 F.R.D. 168, 177 (D.D.C. 1998) (citing In re Exxon

Valdez, 142 F.R.D. 380, 383 (D.D.C. 1992)). Costs may also include

a non-party's legal fees, in order to protect nonparties from being

"forced to subsidize an unreasonable share of the costs of a

litigation to which they are not a party." In re Automotive

Refinishing Paint, 229 F.R.D. 482, 496-97 (E.D. Penn. 2005).

The parties here did not extensively discuss costs or cost shifting in the present motions. Nfinity attached a declaration asserting that the cost of compliance would "be approximately $250,000," but this figure appears to represent the cost of complying with the entire subpoena rather than the narrower production ordered here. (ECF No. 6-3 at 3.) Under the Federal Rules, the court has a duty to address this issue. The court will decide the exact allocation of costs once the production is complete and after Nfinity files a motion with supporting records. Fusion Elite is on notice that the undersigned believes requiring the moving party to shoulder the fees and costs of the production is appropriate given the volume of documents requested and non-party status of Nfinity. The parties are advised to act prudently and expeditiously throughout the production process.

### III. CONCLUSION

For the above reasons, Fusion Elite's Motion to Compel is GRANTED in part and DENIED in part and Nfinity's Cross-Motion to Quash is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

April 20, 2022
Date